**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 12-2232

———

CHRISTOPHER FURLAN; VALERIE FURLAN, Parent and Natural Guardian of
R.T.F.

Appellants

v.

SCHINDLER ELEVATOR CORP.

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2:10-cv-06870)
District Judge: Honorable Jan E. DuBois

———

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
March 19, 2013

Before: SMITH, GREENAWAY, JR., and VAN ANTWERPEN, *Circuit Judges*.

(Opinion Filed: March 19, 2013)

———

OPINION OF THE COURT

———

VAN ANTWERPEN, *Circuit Judge*.

Christopher and Valerie Furlan, together and as parents of their three-year-old son

(collectively "Appellants"), appeal from the United States District Court for the Eastern

District of Pennsylvania's Order granting Schindler Elevator Corporation's ("Schindler")

motion to preclude testimony of Appellants' expert witness and granting Schindler's

motion for summary judgment. For the reasons that follow, we will affirm.

## I. Facts

Because we write for the parties, we review only the essential facts necessary for

resolution.[1] On Memorial Day, May 29, 2006, Appellants were perusing the aisles of the

Boscov's Department Store in the Granite Run Mall in Media, Pennsylvania. While the

family was on the lower level of the department store, the Furlans' three-year-old son

somehow got his hand caught in the return area of the "down" escalator. The return area

constitutes the space where the escalator's moving handrail enters the escalator's

"balustrade"—that is, the escalator's side wall. As a safety precaution, the return area is

surrounded by a plastic guard, meant to protect against just this sort of accident. This

plastic guard, appropriately, is referred to as a "hand" or "finger guard."

No one saw the accident, but the Furlans rushed to their son upon hearing his

screams. The son's left hand was lodged in the escalator's return area all the way to his

palm. Mr. Furlan immediately pressed the escalator's emergency stop button, pulled his

son's hand from the opening, and assessed the damage. The son's hand was injured, and

Mr. Furlan observed "a lot of denuded flesh." (Appendix "App." at A128.) The family

immediately rushed the son to the nearest emergency room. After surgery and physical

---

[1] Additionally, because we are tasked with reviewing a grant of summary judgment, we set forth the facts in the light most favorable to Appellants. *See Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511–12 (3d Cir. 1994) (factual inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true" (quoting *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992))).

therapy, the record reflects that the son seems, thankfully, to have regained full use of his hand.

Schindler's involvement in this litigation arises from a contract for repairs and preventative maintenance between Schindler and Boscov's. According to the Preventative Maintenance Agreement ("PMA"), Schindler was and is contractually obligated to perform maintenance and upkeep services on the elevators and escalators in several Boscov's stores, including the one located in the Granite Run Mall. The contract dictates that Schindler "[t]est all operating and safety devices as required" by the American National Standards Institute ("ANSI") A-17.1 safety code applicable to elevators and escalators.[2] (*Id.* at A213.) Schindler was also obligated to "make only those replacements, adjustments, and repairs required . . . due to ordinary wear and tear"; and was "not . . . required to . . . install new devices on the equipment which may be recommended or directed[,] . . . make changes or modifications in design, [or] . . . make any replacements with parts of a different design." (*Id.* at A215.) Boscov's guaranteed to "provide a safe work place" for Schindler employees, and Schindler would "notify [Boscov's] of any work place or conditions [it] believed to be unsafe." (*Id.*) Schindler also assumed no responsibility for certain items and parts of the elevators and escalators, which included the escalator balustrades. (*Id.* at A213, A215.)

---

[2] Because the escalator in question was installed in 1974, the 1971 edition of the ANSI Code applies. Later editions of the ANSI do not apply retroactively. Section 805 of the 1971 edition of the ANSI Code enumerates the operating and safety devices required on all escalators. A hand or finger guard is not among those classified "operating and safety devices." (App. at A378–81.)

3

Appellants initiated this action in the Court of Common Pleas of Delaware County, Pennsylvania. Appellants' original complaint brought claims of strict products liability, breach of warranties, and negligent maintenance. On Schindler's motion, the case was removed to the United States District Court for the Eastern District of Pennsylvania on diversity grounds.[3] Appellants later withdrew their claims for strict products liability and breach of warranties, and proceeded on only their negligent maintenance claim. At the close of discovery, Schindler filed a motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) to exclude the testimony of Appellants' expert witness, Richard Kennedy. Schindler also filed a companion motion for summary judgment. On March 29, 2012, the District Court granted Schindler's *Daubert* motion and entered summary judgment in Schindler's favor. Appellants then filed a timely appeal.[4]

## II. Standard of Review

We exercise plenary review over the District Court's interpretation of Federal Rule of Evidence 702. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000). But we review the decision to exclude expert testimony for abuse of discretion. *Gen. Elec.*

---

[3] Appellants are citizens of Pennsylvania, and Schindler is an entity incorporated in the State of Delaware, with its principle place of business in New Jersey. 28 U.S.C. § 1332; *id.* § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . . ."); *see also Caterpillar Inc. v. Lewis*, 519 U.S. 61, 67–68 (1996). Also, section 1332's amount in controversy requirement is fulfilled, as at the time of removal Appellants had yet to abandon their strict products liability and breach of warranties claims. (*See* App. at A332–34 (original complaint demanded damages of $150,000 plus interest and costs).)

[4] We exercise jurisdiction under 28 U.S.C. § 1291.

*Co. v. Joiner*, 522 U.S. 136, 139 (1997). We review *de novo* whether summary judgment was appropriate. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 (3d Cir. 2005).

## III. Discussion

For the reasons that follow, we will affirm the District Court's Order granting Schindler's motion to preclude testimony of Appellants' expert and entering summary judgment in Schindler's favor.

### A. Expert Testimony

It was not an abuse of discretion for the District Court to have precluded Appellants' expert, Robert Kennedy ("Kennedy"), from testifying. The District Court excluded Kennedy's testimony on the ground that it was not sufficiently reliable. Appellants argue that we interpret the requirements for admissibility of expert testimony in a liberal fashion; and that Kennedy's practical experience in the field of elevator and escalator maintenance qualifies his opinion as reliable. Alternatively, Appellants argue the District Court abused its discretion by failing to hold an *in limine* hearing prior to ruling on the *Daubert* motion. In response, Schindler argues an *in limine* hearing was unnecessary, as the expert report, deposition testimony, and briefing were enough for the District Court to have concluded Kennedy's opinion was unreliable.

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

5

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. *Daubert* explains courts' gatekeeping function under Rule 702 is "a flexible one"; and the focus "must be solely on principles and methodology, not on the conclusion that they generate." *Daubert*, 509 U.S. at 594–95.

We have recognized Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "Qualification refers to the requirement that the witness possess specialized expertise." *Id.* To establish reliability, the testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his on [sic] her belief." *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.* (*Paoli II*), 35 F.3d 717, 742 (3d Cir. 1994)) (internal quotation marks omitted).[5] As for fit, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.*

---

[5] Factors to be taken into consideration when evaluating the reliability of a particular methodology include:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir. 2000).

Whether to hold an *in limine* hearing upon a *Daubert* objection is an issue that "rests in the sound discretion of the district court." *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable."). A hearing may not be required in all circumstances, particularly where the depositions, affidavits, or briefing before the court are sufficient to perform a proper analysis. *See Oddi*, 234 F.3d at 151–54.

Here, we conclude that the District Court did not abuse its discretion in failing to order an *in limine* hearing. Appellants claim the record is incomplete, alleging the questions at Kennedy's deposition prevented disclosure of relevant information. But, at the same time, Appellants refrain from suggesting what information Kennedy was prevented from disclosing or how that information would have advanced their position. As a result, we reject Appellants' claim that the District Court should have provided an *in limine* hearing. The record before the District Court—which included Kennedy's deposition, Kennedy's expert report, and briefing by the parties—was sufficiently developed for the court to have concluded a hearing was unnecessary.

Additionally, after careful review, we conclude that the District Court did not abuse its discretion in excluding Kennedy's opinion. In particular, the District Court was within its authority to have concluded that Kennedy's report and deposition testimony failed to demonstrate a reliable methodology for his opinion. The crux of Kennedy's

7

opinion is that, first, the PMA required Schindler to maintain the integrity of the escalator's finger guard. Second, Kennedy opined that because Appellants' son's hand became caught in the machine, the escalator's finger guard must have been worn down. He based this opinion, in part, on his review of several photographs of the finger guard at issue.

Ignoring any issue with Kennedy's interpretation of the PMA,[6] Appellants have failed to show that Kennedy's opinion on the integrity of the finger guard is reliable. Kennedy testified he had no experience with the particular escalator model at issue and did not physically inspect the escalator until *after* his report was written. Kennedy also concluded the finger guard was "worn," and that, therefore, Schindler had negligently maintained that instrument. But this opinion was based on only (1) amateur photographs taken at least a week after the accident had occurred and (2) the fact that the Appellants' son managed to get his hand passed the guard and caught in the escalator's handrail return. Kennedy did not compare the photographs of the finger guard at issue with a model (or, even, an additional photograph) of that same finger guard in a new condition. In fact, Kennedy admitted that he had never seen that model of finger guard in a new condition. Kennedy also admitted to having conducted no tests to determine the adequacy of maintenance performed on the finger guard. Indeed, his testimony does not

---

[6] On appeal, the crux of the dispute has focused on Kennedy's opinion only as it relates to the condition of the finger guard. We therefore do not discuss Kennedy's interpretation of the PMA. *See McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 95 n.5 (3d. Cir. 2012) (explaining that a party waives an issue not raised in its opening brief on appeal).

8

show he used any methodology "beyond his own intuition," *Oddi*, 234 F.3d at 158, in concluding the finger guard was "worn."

As such, there is no evidence to support a conclusion that Kennedy used a reliable methodology to conclude the finger guard was worn. The evidence presented shows Kennedy's methodology amounts to mere speculation. Essentially, Kennedy's argument is wholly tautological: "The finger guard did not work as it was supposed to because it did not work as it was supposed to." An exchange from Kennedy's deposition may be illustrative:

> Q.      And do you agree that the photographs show that the finger guard is in good condition?
> A.      I would not say that.
> Q.      Why not?
> A.      It looks like it's worn to me.
> Q.      Where is it worn?
> A.      Every one of these photographs shows a space where a small child's hand could get in there.[7]
> Q.      Well, you said it was worn?
> A.      Worn, right.
> Q.      Does the photograph show any conditions of wear to the finger guard?
> A.      These conditions look like they're worn.
> Q.      In what way is the finger guard worn? Does it appear to be damaged?
> A.      Worn.
> Q.      Does it appear to be damaged?
> A.      Well, I don't know what this debris is that's sticking out from it, but it's worn away.
> Q.      When you said it was debris, my question is, Does the finger guard appear to be damaged?
> A.      Damaged to the extent that its worn, yes. It's in a condition that will not meet the requirements of 802.4C.

---

[7] Of course, Kennedy concedes that there must exist some space between the finger guard and the moving handrail in order for the escalator to function. Kennedy is unaware of how small or large that space would have to be to provide maximum efficiency.

9

Q. That's not my question. I want you to use a pen and circle on the photographs where you believe the finger guard is worn?
[COUNSEL FOR APPELLANTS]: Any particular photograph?
[COUNSEL FOR SCHINDLER]: Any of them. All of them.
[KENNEDY]: Can't tell there.

(App. at A243.) Such "methodology" does not satisfy the *Daubert* threshold, even under the most liberal standard.

As a result, we agree that Kennedy's testimony would be no more than a "subjective belief or unsupported speculation," rather than opinion "based on the methods and procedures of science," *Oddi*, 234 F.3d at 158, and thus would not assist the jury in understanding or determining a fact at issue. We will affirm the Order of the District Court precluding Kennedy's expert testimony.

### B. Summary Judgment

We agree that summary judgment was appropriately entered in Schindler's favor, because, as a matter of law, Appellants were unable to meet their burden to establish a claim of negligent maintenance. The District Court found that, with the exclusion of Kennedy's expert testimony, the Appellants had not produced evidence from which a reasonable jury could conclude that Schindler caused the injury at issue. Appellants argue there is a dispute of material fact as to whether the PMA requires Schindler to maintain and repair the finger guard, and that certain evidence indicates that the finger guard was in a defective condition at the time of Appellants' son's injury.

A party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "could affect the outcome of the proceeding, and

10

a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (internal quotation marks omitted). But the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

Appellants' negligent maintenance claim is governed by Pennsylvania law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). As a result, in order to survive summary judgment, Appellants must have set forth facts that demonstrate: "(1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage." *Farabaugh v. Pa. Tpk. Comm'n*, 911 A.2d 1264, 1272–73 (Pa. 2006). "Generally a party to a contract does not become liable for a breach thereof to one who is not a party thereto." *Evans v. Otis Elevator Co.*, 168 A.2d 573, 575 (Pa. 1961). But if a party to a contract "has undertaken to render services to another which he should recognize as necessary for the protection of a third person," a duty of care to those foreseeable third parties arises. *Cantwell v. Allegheny Cnty.*, 483 A.2d 1350, 1353–54 (Pa. 1984) (internal quotation marks omitted). *See also Otis Elevator*, 168 A.2d at 575–76 ("[A] party to a contract by the very nature of his contractual undertaking may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such manner that third persons—strangers to the contract—will not be injured thereby."); RESTATEMENT (SECOND) OF TORTS § 324A (1965). This does not mean that "the service provider must assume additional duties . . . above and beyond the initial undertaking. Rather, it merely prescribes for

11

reasonable care to be taken vis-à-vis the original undertaking and establishes liability to certain third-parties where such care is lacking." *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1244–45 (Pa. 2012).

We agree that Appellants have presented no evidence from which a reasonable jury could conclude that Schindler caused the Furlans' son's injury. Even assuming the PMA created an affirmative obligation on the part of Schindler to maintain and repair the finger guard, Appellants have presented no evidence to support a reasonable jury finding that the finger guard at issue was damaged or in need of maintenance. The existence of the photographs and the occurrence of the accident are not enough to give rise to an inference of causation, *Harvilla v. Delcamp*, 555 A.2d 763, 764 (Pa. 1989) ("[A] plaintiff cannot recover upon proof of the mere happening of an . . . accident."), especially where there has been no evidence presented by Appellants that goes to prove the finger guard, as originally designed and installed, would have prevented the son's injury. (*See* App. at A353 ("finger guards only guard the entrance to the balustrade and do not guarantee that an entrapment will not occur").) *See also supra* note 7.

As a result, because Appellants have not presented facts to establish Schindler's allegedly negligent maintenance was a cause of the accident at issue, we conclude that the District Court was correct in granting summary judgment in Schindler's favor. We will affirm the entry of summary judgment.

**IV.**

For the reasons set forth, we will affirm the Judgment of the District Court.